FIREMAN'S FUND INSURANCE COM-
PANY, a Corporation, et al.,
Appellants,

v.

AALCO WRECKING COMPANY, INC.,
a Corporation, Appellee.

No. 20552.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 18, 1971.

Decided Aug. 7, 1972.

Rehearing and Rehearing En Banc
Denied Sept. 26, 1972.

Dissenting Opinion from Denial of
Rehearing En Banc
Oct. 16, 1972.

Dale I. Larson, Adolph K. Schwartz, Hullverson, Richardson & Hullverson, St. Louis, and Robins, Davis & Lyons, Minneapolis, Minn., for appellants.

Edward D. Weakley, Boyle, Priest, Elliott & Weakley, Howard Elliott, St. Louis, Mo., for appellee.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

Plaintiff insurance companies initiated this subrogation action to recover the damages to their assureds arising from a fire loss at the Shapleigh Warehouse Complex in St. Louis, Missouri, on August 4, 1965. Plaintiffs received a jury verdict against the defendant, Aalco Wrecking Company, Inc., who was engaged in demolition work at the complex; however, on post trial motions the district court granted defendant's motion for judgment n. o. v. and alternatively under Federal Rule of Civil Procedure 50(c) defendant's motion for new trial. Plaintiffs now appeal this judgment. We reverse with direction to enter judgment for the plaintiffs in accordance with the original verdict.

In August 1965 the defendant Aalco conducted demolition work on a group of buildings in downtown St. Louis. In the early morning hours of August 4, 1965, a blaze was discovered in the buildings. At the time of discovery the fire had reached three to five alarm proportions. Soon after the fire department arrived the fire spread out of control damaging the assureds' personal property which was stored in an adjacent building. The cause of the fire was unknown. Plaintiffs claim that the delay in the detection of the fire caused the extensive destruction and resulted from defendant's failure to have a watchman on the premises. Plaintiffs assert that the defendant did not and could not secure the demolition site from intruders and did not maintain a watchman at the site to protect the buildings and notify the fire department of any fires.

The trial court submitted the case to the jury under the following instructions:

"Your verdict must be for the plaintiffs if you believe:

First, a fire started in the area being demolished by the defendant and spread to adjacent property, including that occupied by the insured tenants mentioned in evidence, and

Second, the buildings being demolished by defendant were not secured against transients or vandals and it was not reasonably possible to do so, and defendant provided no watchman while the demolition was not in progress, and

Third, defendant's failure to employ a watchman was negligence, and

Fourth, as a direct result of such negligence there was a delay in discovering and reporting the fire to the fire department, and

Fifth, as a direct result of such delay the fire spread to property occupied by the tenants and caused damages to them and losses to the plaintiffs."

We find substantial evidence to sustain the jury's finding of negligence and proximate cause arising from defendant's failure to employ a watchman.

Although there was conflicting testimony, substantial evidence was presented to establish that at the time the fire was originally discovered it was burning in the area demolished by the defendant, and from there it spread to the adjacent property.

Considerable evidence was offered to prove that defendant did not and could not secure the buildings being razed and that defendant had not employed a

watchman. The Building Code of the City of St. Louis § 2116.2(9) provides:

"All buildings to be razed three stories in height or greater shall be kept secure against entry of transients or vandals. If security is not possible, watchman shall be provided during the hours wrecking is not being accomplished."

Defendant's witnesses agreed that *if* the buildings could be secured, there was no need for a watchman on the demolition site. Implicit in this testimony was the premise that if the buildings were not secure, it was customary within the construction trade in St. Louis to provide a watchman. Thus, one of the focal issues turned on the factual question whether the buildings could be made secure. On the basis of the record presented this court cannot say substantial evidence did not exist to support the jury's finding as to the lack of security in the building complex.

Captain Klein of the St. Louis fire department visited the demolition site on August 3, 1965, the evening before the fire. His testimony reads:

"A. No, I don't recall a single instance where we had to force a door or anything else. Most of the times the doors were hanging open, and we just walked right through.

"Q. Did you normally walk through the buildings?

"A. Right.

"Q. On the evening of August 3, 1965, did you have occasion to observe whether the fire doors, many of which are exposed and showing as little brown cardboard spots on this model, were open or closed?

"A. I'd say for the most part they were either open or gone entirely.

"Q. All right, sir. Now, in prior visits when you went into the building, Captain, or the buildings, did you have any difficulty gaining·access to Building No. 11?

"A. None whatsoever. No. In fact, we had driven the battalion car in there and turned it around inside this building. It was large enough for a truck.

. . . .

"Q. And at any time when you were in these buildings, Captain, had you had any difficulty in gaining access from one to the other?

"A. No, none whatsoever." App. at 262–263.

Several other witnesses verified that the buildings were not always secure. Even Aalco's superintendent indicated that it was impractical to secure portions of the complex.

The evidence amply supports the conclusion that there was a delay in discovering and reporting the fire. The record shows that Captain Klein estimated that the fire had been burning up to one hour before the fire department's arrival. The record also shows that there was a Potter electronic supervisory alarm line which was grounded at 2:10 a. m., twenty-one minutes before any report of the fire.[1]

Defendant challenges plaintiffs' right to recover on the basis that defendant's failure to provide a watchman did not constitute (1) negligence or (2) the proximate cause of the plaintiffs' damage. We must disagree.

 Violation of a city ordinance under Missouri law is evidence of negligence. See Dickerson v. St. Louis Pub-- lic Service Co., 365 Mo. 738, 286 S.W.2d

---

1. The Potter Electric Alarm Company had installed and was monitoring the fire sprinkler systems for the entire complex. Because of the demolition project's interference with its existing electrical cables, a temporary plastic cable was run along the sprinkler piping and spliced to the original cable in order to supervise the remaining buildings. At 2:10 a. m. on August 4, 1965, Potter recorded a "ground" signal which meant that the insulation surrounding the wire was destroyed and was touching a conductor to the ground, such as the sprinkler piping. There was no dispute that the fire caused Potter's "ground" signal, and as a result of the "ground" no alarm could be received from the sprinkler systems.

820, 824 (1956); Wells v. Henry W. Kuhs Realty Co., 269 S.W.2d 761, 767 (Mo.1954). See also Cichacki v. Langton, 392 S.W.2d 397, 400 (Mo.1965).[2] Although the ordinance was offered and received in evidence, the plaintiffs did not request an instruction on it nor did the trial court instruct the jury under it. Nevertheless, the jury could without error consider the ordinance as evidence of negligence. The failure of the court to instruct on the ordinance was not prejudicial to the defendant. Section 2116.2(a) of the Building Code of the City of St. Louis was expressly enacted, along with other sections, to require fire safety precautions and to avoid fire hazards. Plaintiffs' assureds were clearly within the class of beneficiaries whom the Code sought to protect. However, notwithstanding consideration of the ordinance, there existed sufficient credible testimony, including statements from the defendant's own witnesses, that it was the custom recognized in the construction trade in St. Louis to have a watchman on demolition premises unless the premises could be made secure.

 Under common law where a party fails to provide protection against known dangers, that failure has been held to be negligence. Cf. Imperial Oil, Ltd. v. Drlik, 234 F.2d 4 (6 Cir. 1956), cert. denied, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236 (failure to post a watchman at the rail of a vessel to warn the ship's winch operator of danger to dock crewman from suddenly-drawn-taut mooring lines); Brumm v. Goodall, 16 Ill.App.2d 212, 147 N.E.2d 699 (1958) (failure to provide sufficient lifeguard supervision); Richardson v. Ham, 44 Cal.2d 772, 285 P.2d 269 (1955) (undue

risk of harm created by an unattended bulldozer); Stoutwell v. Board of Trustees of Stanford Univ., 64 Cal.App.2d 197, 148 P.2d 405 (1944) (failure to have a sufficient number of police to protect university students); Stevens v. City of Pittsburgh, 329 Pa. 496, 198 A. 655 (1938) (lack of proper supervision of young boys firing rifles); Rovegno v. San Jose Knights of Columbus, 108 Cal. App. 591, 291 P. 848 (1930) (failure to furnish lifeguards).

 If an owner of property negligently allows the spread of a fire on his premises, he may be liable for injury to others even though he has no connection with the fire's origin. See Capra v. Phillips Investment Co., 302 S.W.2d 924, 928 (Mo.1957). See also Willard v. Bethurem, 234 S.W.2d 18 (Mo.App.1950); Steele v. Darner, 124 Mo.App. 338, 103 S.W. 582 (1907). In Reid v. Sibell, Inc. v. Gilmore & Edwards Co., 134 Cal.App. 2d 60, 285 P.2d 364 (1955), the defendant was storing highly inflammable liquids in its section of a building also occupied by plaintiff. The building caught fire, and plaintiff contended that the fire spread and injured plaintiff's property as a result of the combustion of the liquids stored by defendant. Plaintiff complained that defendant was negligent, not for starting the fire, but for failing to take reasonable precautions to prevent the spread of the fire since it knew that if a fire was to start, the high flammability of its stored liquids would cause the fire to readily endanger plaintiff's property. The court agreed, saying:

"There seems no sound reason to restrict this right and its corresponding duty to acts which contribute to the

2. Another suit arising out of this same fire loss was brought by different plaintiffs and resulted in a verdict for Aalco in the Missouri state court. See Washington University v. Aalco Wrecking Co., Docket No. 55,193 (Mo.1971). On appeal the judgment for the defendant was affirmed. However, in January 1972 the court entertained a rehearing on the question whether violation of the Building Code provisions (including § 2116.2(9))

constituted negligence per se. The plaintiffs apparently, as here, did not request an instruction on the ordinance although the ordinance was received into evidence. It is significant that the Missouri Supreme Court did not reject plaintiffs' theory of common law negligence and proximate cause which was identical to that which has been asserted here. As of this writing no decision has been rendered on the reargument.

origin of a fire, as distinguished from its spread. In other jurisdictions, the rule, particularly in the later cases, appears to follow the view that one is liable for acts or omissions which cause the spread of fire of whatever origin." 285 P.2d at 368.

In view of all the surrounding circumstances, we conclude that the trial court properly submitted to the jury the issue of negligence arising from the defendant's failure to furnish a watchman on the premises.

Defendant likewise challenges the submission to the jury of the question whether the failure to furnish a watchman constituted the proximate cause of the fire spreading to the property of plaintiffs' assureds. The defendant argues that it is speculative whether a watchman could have seen the fire in sufficient time to have prevented its eventual destruction.

■ It is well settled under the law of Missouri that the causal connection between negligence and harm need not be established by direct evidence. Causation may be established by proof of facts and circumstances from which the connection may be reasonably inferred. State ex rel. City of St. Charles v. Haid, 325 Mo. 107, 28 S.W.2d 97, 102 (1930); Phillips v. Stockman, 351 S.W.2d 464, 473 (Mo.App.1961); Leek v. Dillard, 304 S.W.2d 60, 65 (Mo.App.1957); Long v. F. W. Woolworth Co., 232 Mo.App. 417, 109 S.W.2d 85, 88 (1937).[3]

There were many evidential factors which the jury could have properly considered relating to the issue of proximate cause: (1) demolition premises are recognized as a highly hazardous fire area; (2) the ground wires on the fire alarm indicated the fire had burned for at least one-half hour before it was visually discovered and reported; (3) the fire was observed from three blocks away by a night watchman twenty-one minutes after the electrical alarm was grounded; (4) Captain Klein of the St. Louis fire department testified that in his opinion if the fire had been reported fifteen minutes earlier, damage to the adjoining property would have been averted; (5) the fire had been burning up to an hour before the fire department arrived and two of the buildings were completely engulfed in flames.

In Steele v. Woods, 327 S.W.2d 187, 195 (Mo.1959), the Missouri Supreme Court recognized that:

"It is sufficient if there is substantial evidence which shows that the injury is a natural and probable consequence of the negligent act or omission. And this can be determined by reasonable inference from proven facts or circumstantial evidence. Where the logical conclusion from the evidence is that if certain things were properly done certain results would not have occurred, and they *did* occur, the question of causal connection is sufficient to go to the jury."[4]

3. The United States Supreme Court in Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946), aptly observed:

"Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."

4. In Rovegno v. San Jose Knights of Columbus, 108 Cal.App. 591, 291 P. 848 (1930), the California court stated:
"[T]he only negligence alleged is the failure of respondents to provide a lifeguard or other person or persons skilled in life saving. Even had such a guard been present, respondents urge, there is no showing that the boy's life would have been saved. Just what would have happened had a lifeguard been present is, of course, not capable of direct proof. It is largely a matter of speculation or of inference. Even so, it has been held that the question is one for the jury and not one for the court." 291 P. at 849–850.

■ There are many instances in tort litigation where precise causation becomes difficult to prove. There is no exact way to prove that the harm might have been avoided, because the harm did in fact take place. Thus, whether a fall in an inadequately lighted area would not have occurred if the premises had been properly lighted,[5] whether typhus disease would have been contracted if it had not been for a rat infested cellar of an apartment project,[6] or whether an explosion would have occurred even with proper ventilation,[7] each requires a judgment of whether the defendant's conduct causally contributed to the harm. A plaintiff does not have the negative burden to show that the harm could not have possibly occurred if the defendant had performed the duty breached. It would be absurd to say that a defendant could hide behind such absence of proof where his own conduct has created the fertile ground for harm and the harm did in fact occur. It has long been recognized that:

"[I]f the actor's negligence, either of act or omission, results in harm of the sort from which the duty was designed to protect the other, his negligence may be regarded as a substantial factor in bringing about the harm in spite of the fact that the same harm might possibly have been sustained had the actor not been negligent." State of Maryland for Use of Pumphrey v. Manor Real Estate & Trust Co., 176 F.2d 414, 418 (4 Cir. 1949).[8]

We conclude that the evidence was sufficient for the jury to pass on the question of proximate cause. Thus, we conclude the trial court erred in granting a judgment notwithstanding the verdict.

■ The trial court also granted defendant's alternative motion for a new trial. Generally this court has upheld the exercise of the trial court's grant of a new trial as within his discretion. Silverthorn v. Hennigan, 439 F.2d 704, 705 (8 Cir. 1971); Bates v. Hensley, 414 F.2d 1006, 1011 (8 Cir. 1969); Simpson v. Skelly Oil Co., 371 F.2d 563, 566–567, 570 (8 Cir. 1967); Bankers Life & Casualty Co. v. Kirtley, 307 F.2d

---

5. Swanson v. Goodwin, 327 S.W.2d 903 (Mo.1959).

6. State of Maryland for Use of Pumphrey v. Manor Real Estate & Trust Co., 176 F.2d 414 (4 Cir. 1949).

7. Marshall v. Humble Oil & Refining Co., 459 F.2d 355 (8 Cir. 1972).

8. See also Restatement (Second) of Torts, § 433B, Comment a (1965),
 "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."
 This statement is to be balanced by comment b.
 "The plaintiff is not, however, required to prove his case beyond a reasonable doubt. He is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. In drawing that conclusion, the triers of fact are permitted to draw upon ordinary human experience as to the probabilities of the case. Thus when a child is drowned in a swimming pool, no one can say with absolute certainty that a lifeguard would have saved him; but the common experience of the community permits the conclusion that the guard would more probably than not have done so, and hence that the absence of the guard has played a substantial part in bringing about the death of the child. Such questions are normally for the jury, and the court may seldom rule on them as matters of law."

418, 423 (8 Cir. 1962); Altrichter v. Shell Oil Co., 263 F.2d 377, 380 (8 Cir. 1959). When evidence is erroneously admitted or excluded or where the trial court has erred in the instructions to the jury, the trial court is considered in a better position to correct a manifest injustice in ruling on the motion for new trial. Under these circumstances the grant of the new trial does not interfere with the role of the jury as the trier of fact. Cf. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L.Ed. 147 (1940); Lind v. Schenley Industries, Inc., 278 F.2d 79, 90 (3 Cir. 1960), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60. However, we are not faced with this kind of ruling here.

The basic ground relied on by the trial court for granting a new trial in the present case indicates that the court was greatly influenced by its appraisal that the evidence failed to make out a submissible case for the jury to consider. The trial court cited ten grounds for its conditional grant of a new trial. Seven of those grounds were repetitious of the grounds given by the court in support of its judgment n. o. v., relating to the lack of substantial evidence to support the verdict. For the reasons we have previously discussed, we feel the court's judgment n. o. v. was in error.[9]

■ Although the trial court does not make a specific finding that "the verdict was contrary to the clear weight of the evidence," this court has held that a finding that "the verdict is contrary to the evidence" is to be considered its equivalent. See Lack Industries, Inc. v. Ralston Purina Co., 327

F.2d 266, 273 (8 Cir. 1964). Thus, we conclude the only possible valid ground for the granting of the new trial was that the trial court felt "the verdict is against the clear weight of the evidence."

In Simpson v. Skelly Oil Co., 371 F. 2d 563, 566–567 (8 Cir. 1967), this court recognized:

> "There is a difference in the function of a judge when he is ruling on a motion for a directed verdict or a judgment n. o. v. and when he passes on a motion for a new trial. . . . In the former instance, it is his duty to accept the plaintiff's version as true for the purposes of the motion, notwithstanding the existence of strong testimony to the contrary; the judge is not concerned with the weight of the evidence. On the motion for new trial, however, he has wider, *though not unlimited,* latitude and he may set the verdict aside where it is against the weight of the evidence, or to prevent injustice." (Emphasis ours.)

■ Notwithstanding this broad latitude, as noted in the *Simpson* case, there exist some boundaries to the exercise of the trial court's discretion in granting a new trial. Although stated with reference to a judgment n. o. v., the Supreme Court in Tennant v. Peoria and Pekin Union Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944), explained: "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." We find, as have other circuit courts

---

9. Defendant's motion also complains that certain testimony of Captain Klein was believed to be too speculative; however, the defendant never objected to its admission. We find no error in this testimony. The trial court also cited plaintiffs' failure to offer evidence of diversity of citizenship. The plaintiffs have belatedly introduced uncontroverted affidavits establishing their out-of-state citizenship for diversity purposes. It is fundamental that a new trial should not be granted to rectify such technical failure resulting in harmless error. See Fed.R.Civ.P. 61; Illinois Terminal R. R. v. Friedman, 208 F.2d 675, 680 (8 Cir. 1953). See also 6a Moore, Federal Practice, ¶ 59.08 [1], at 3774 & n. 8 (2d ed. 1971).

of appeals,[10] this admonition similarly applicable in dealing with motions for new trial.

■■■ It has been recognized in the *Lind* case, supra, that where the trial court finds the verdict contrary to the weight of the evidence and grants a new trial that the appellate court should "exercise a closer degree of scrutiny and supervision . . . in order to protect the litigants' right to jury trial." 278 F.2d at 90. See also 6a Moore, Federal Practice, ¶ 59.08 [5] at 3819 (2d ed. 1971). Other circuit courts have expressed similar reservations although sometimes using different terminology. Thus, it has been held that a trial judge should not grant a new trial merely because he believes another result would be more reasonable. Duncan v. Duncan, 377 F.2d 49, 52 (6 Cir. 1967), cert. denied, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260. Nor should a new trial be granted where there is no valid or useful purpose for submitting the case to another jury. O'Neil v. W. R. Grace & Co., 410 F. 2d 908, 915 (5 Cir. 1969). Where the subject matter of the litigation is simple; where there exists no complicated evidence or where the legal principles presented are such that they would not confuse the jury, the court should be reluctant to grant a new trial. See O'Neil v. W. R. Grace & Co., supra at 913; Lewin v. Metropolitan Life Ins. Co., 394 F.2d 608, 614–615 (3 Cir. 1968); Tidewater Oil Co. v. Waller, 302 F.2d 638, 643 (10 Cir. 1962). The Fifth Circuit in Cities Service Oil Co. v. Launey, 403 F.2d 537 (1968), following Hampton v. Magnolia Touring Co., 338 F.2d 303 (5 Cir. 1964), delineates a basis on which a trial court may require a new trial on the weight of the evidence. The court wrote:

"Although the cases are not consistent in usage, some cases using the phrase 'clear weight' and others using the phrase 'overwhelming weight' or 'overwhelming evidence,' it seems clear that the jury's verdict must at least be against the *great* weight of the evidence before a new trial may be granted." 403 F.2d at 540.

Otherwise, the Fifth Circuit adds, it "would destroy the role of the jury as the principal trier of the facts, and would enable the trial judge to disregard the jury's verdict at will." We endorse these observations.

■■■ Regardless of the rhetoric used the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred. When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not. As in so many other areas of the law, the trial court's judgment is always subject to review under the relevant criteria of law and facts at hand. *See* 28 U.S.C.A. § 2106.

■■■ In the present case we find that the evidence presented does not require reconsideration by a new jury. The evidence is such that reasonable men may differ as to the result, therefore, the determination should properly be left for the jury. See Berner v. British Commonwealth Pac. Airlines, Ltd., 346 F.2d 532, 538 (2 Cir. 1965), cert. denied, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). As to the evidence within the record, there exists no significant weight factor favoring the defendant. In fact, in a second trial plaintiffs would be entitled to a favorable instruction on the St. Louis Build-

10. See Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21, 24–25 (9 Cir. 1971), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682; Cities Service Oil Co. v. Launey, 403 F.2d 537, 539–540 (5 Cir. 1968); Duncan v. Duncan, 377 F.2d 49, 52 (6 Cir. 1967), cert. denied, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 260; Schybinger v. Interlake Steamship Co., 273 F.2d 307, 312 (7 Cir. 1959).

ing Code. We are hard pressed to say that a miscarriage of justice has taken place in the first trial. We cannot approve under the existing circumstances another time-consuming and costly trial without better justification on the record. All courts should be sensitive to and reasonably avoid crowded dockets. Cf. Blonder-Tongue Lab., Inc. v. University of Ill. Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Because no good purpose would be served by a second trial and weighing all relevant factors we hold that it was abuse of discretion to grant a new trial.

Judgment reversed and remanded with directions to enter a judgment on the verdict for the plaintiffs.

## ON PETITION FOR REHEARING EN BANC

MEHAFFY, Circuit Judge, joined by MATTHES, Chief Judge, dissenting from the denial of rehearing en banc.*

I respectfully dissent from the denial of the petition for rehearing en banc.

I disagree with that portion of the majority opinion which reversed the trial court's order granting a new trial and restored the verdict of something in excess of $200,000.00. In my view, the panel's holding in effect overrules a deeply embedded rule of law in this circuit and ignores the teachings of the Supreme Court in cases of this nature.

*The Eighth Circuit Rule.*

In this circuit a "motion for new trial is addressed to the judicial discretion of the trial judge and will not be reversed except for a *clear abuse* of that discretion." Altrichter v. Shell Oil Co., 263 F. 2d 377, 380 (8th Cir. 1959) (emphasis added); Bates v. Hensley, 414 F.2d 1006 (8th Cir. 1969). The rule has also been stated that the "granting of a new trial is a matter within the sound discretion of the trial judge and unless that discretion *patently* has been abused, his ruling is not subject to review." Silverthorn v. Hennigan, 439 F.2d 704, 705 (8th Cir.

1971) (emphasis added). The opinion in *Altrichter* gives some insight as to what these words "clear abuse" mean. In that case we held that the trial court could weigh the evidence, disbelieve witnesses and grant a new trial even where there is substantial evidence to sustain the verdict. No inferences are required to be drawn in favor of the verdict or the party against whom the motion is directed. The trial judge may grant a new trial where, in his own judgment, it is necessary to prevent a miscarriage of justice. I note the language of Barron & Holtzoff, quoted with approval in *Altrichter, supra,* at 380: "It is his right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so."

*Examples of Facts which Clearly Distinguish This Case from Those Cited in the Panel's Opinion.*

The panel relied upon and quoted extensively from Captain Klein's testimony. His testimony was objected to as speculative and calling for a conclusion that the fire department would probably have stopped the fire before it caused plaintiffs' losses if he had received an alarm ten to fifteen minutes earlier. The panel's statement that Klein's testimony was not objected to is clearly wrong. Although the trial judge overruled the objection, he assigned this ruling as one of his grounds for granting a new trial. Captain Klein had testified that the major portion of the fire was in building No. 11 behind the freight loading area of that building, that the fire was above the canopy of the northernmost bridge and just starting on the bridge, and that the bridge was not engulfed in flames at the time of the arrival of the fire department. He further testified that his men were putting water on one of the bridges until he ordered them out of the area. His testimony was to the effect that only building No. 11 was "heavily involved" at the time of their arrival. His testimony as to whether the bridge was on fire is controverted by the

---

\* Judge Gibson did not participate.

testimony of Captain Berne of the fire department, fireman Holland, and a railroad employee, Anielak, who had reported the fire and arrived at the scene before the firemen. Fireman Holland testified that he was one of the firemen on the ramp with the fire hose, that the water would not reach the bridge, that the fire eventually crossed the bridge into the buildings containing plaintiffs' insureds' property. Mr. Cohn, an expert witness, testified that the fire started, not in building No. 11, but "towards the east end of the northernmost bridge." Evaluating the evidence according to the analysis of the trial court, Captain Klein's opinion as to whether the fire department could have stopped the fire was based on untrue facts and was speculative and conclusionary.

The trial court also stated that the evidence was insufficient to support a finding of negligence. Plaintiffs' proof was to the effect that a watchman should have been at this site because the site could not be made secure against entry. While there is some evidence to support this contention, much of plaintiffs' evidence relates to buildings 11 and 12. Building 12 was in reality nothing but a wall with some supporting timbers. There was nothing to secure. Much of plaintiffs' evidence tending to show the unsecured condition of building 11 related to the first and second floors. The first floor was in fact a ground level railroad yard, and there was testimony that it was not considered part of the building. The second floor was an open loading area for trucks constructed of steel and concrete. It is apparently this area into which Captain Klein drove his car. There was nothing to secure except a large open area. There was ample testimony that passageways from these areas into the buildings were secured. Again viewing the evidence according to the analysis of the trial court, it is difficult to see any clear abuse of discretion in ordering a new trial on this point.

Further, a witness for one of the plaintiffs testified in effect that after collecting the insurance on some of his property he sold the insured goods at a price higher than their cost. He thus showed a profit instead of a loss. No damages should have been allowed on this point, and the trial court's order for a new trial should be sustained on this point.

By setting out the above, I have not implied that those points are the only ones to be considered. Rather, they are examples which support a finding that there was no clear or patent abuse of discretion in ordering a new trial.[1]

*The Supreme Court's Teachings.*

The panel's opinion relies on and quotes from Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944). *Tennant,* however, did not even consider a motion for new trial, but involved only a judgment n.o.v. granted by a court of appeals. This was an opinion by Mr. Justice Murphy for a divided Court. *Tennant* should be considered in the light of other Supreme Court cases such as Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439 (1933); United States v. Socony-Vacuum Oil Co., 310 U.S. 150 at 247, 60 S.Ct. 811, 84 L. Ed. 1129 (1940); United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946), which did deal with motions for new trial. *See also* Neely v. Martin K. Eby Const. Co., 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); Neese v. Southern Ry., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955).

As Justice Brandeis said in *Fairmount Glass Works, supra*:

> "The rule that this Court will not review the action of a federal trial court in granting or denying a motion for a new trial for error of fact has been settled by a long and unbroken line of decisions; and has been frequently applied where the ground of the motion was that the damages awarded by the jury were excessive or were inadequate. The rule precludes likewise a review of such action by a circuit

1. The majority's opinion finds only that "it was abuse of discretion to grant a new trial."

court of appeals." (Footnotes omitted.) 287 U.S. at 481, 53 S.Ct. at 254. In the same opinion Justice Brandeis went on to say:

"Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct." *Id.* at 485, 53 S.Ct. at 255.

Similarly the Court stated in United States v. Johnson, *supra*, that:

"[I]t is not the province of this Court or the circuit court of appeals to review orders granting or denying motions for a new trial when such review is sought on the alleged ground that the trial court made erroneous findings of fact." 327 U.S. at 111, 66 S. Ct. at 466.

The Court then went on to conclude that:

"The circuit court of appeals was right in the first instance, when it declared that it did not sit to try de novo motions for a new trial. It was wrong in the second instance when it did review the facts de novo and order the judgment set aside." *Id.* at 113, 66 S.Ct. at 467.

*Conclusion.*

The panel claims in its conclusion that it is hard pressed to say that a miscarriage of justice has taken place in the first trial. The only sure way to prevent a miscarriage of justice in this case is to grant the rehearing and sustain the trial court's order granting a new trial. This is a complicated case with a lengthy record and it clearly requires something more than a weighing of the evidence when the trial court has concluded that it mistakenly admitted testimony which could well have influenced the jury. The effect of it cannot be ascertained except by a new trial.

The rationale of avoiding additional burdens for the court dockets, used as one of the reasons for reversing the new trial order, is misleading. There is no way to predict how much additional work will be created if the rule of this circuit in such matters is abrogated. If we must follow the panel's new rule, it will place this court in the role of trying cases de novo for which we are not and cannot be equipped. Furthermore, this new appellate capacity threatens to erode the factfinding responsibility of the district courts.

Finally, I note that the panel's opinion finds there was an abuse of discretion. Certainly it is not an abuse of discretion to grant a new trial when inadmissible testimony is admitted. Now we can assume that every party litigant in a case where there is a new trial granted by the district court will contend that there is a mere abuse of discretion on the trial court's part; hence, the trial court's action should be reversed and judgment entered here.

For the reasons stated, I would grant the petition, uphold the trial court and send this case back to that court for a new trial.